[Civ. No. 3557. Third Appellate District.—September 24, 1928.]

AMANDA META SALTER, Respondent, v. ROBERT MARSH, Appellant.

Clyde C. Shoemaker and Woodruff & Shoemaker for Appellant.

Hunsaker, Britt & Cosgrove and John N. Cramer for Respondent.

PLUMMER, J.—The plaintiff had judgment in an action of *assumpsit* for the sum of $10,000 and interest thereon from the thirteenth day of February, 1924, from which judgment the defendant appeals.

The complaint in the action contains three counts. The first count in the complaint alleges that on June 13, 1924, the defendant was indebted to plaintiff in the sum of $42,612.50, with interest thereon at the rate of seven per cent per annum from February 13, 1924, amounting to the sum of $994.29. That on said last-mentioned date defendant paid to plaintiff on account thereof the sum of $33,379.80,

leaving a balance due plaintiff of $10,000, with interest thereon at the rate of seven per cent per annum from February 13, 1924. That said last-mentioned sum has not been paid and is wholly due. The second cause of action alleges that on June 13, 1924, defendant was indebted to plaintiff in the sum of $10,233.33, for and on account of the money received by defendant to the use of plaintiff, no part of which has been paid.

The court sustained a motion for nonsuit as to the third cause of action, and as the propriety of said motion is not involved upon this appeal, the third alleged cause of action is omitted.

The original answer of the defendant denies the indebtedness to the plaintiff, and then, by an amended answer, sets up that on or about the eleventh day of June, 1924, the plaintiff, by way of compromise, agreed to accept the sum of $32,612.50, with interest thereon at the rate of seven per cent per annum from February 13, 1924, in full satisfaction of the indebtedness then owing by the defendant to the plaintiff.

The court found that on the thirteenth day of June, 1924, the defendant was justly indebted to the plaintiff in the sum of $42,612.50, with interest thereon at the rate of seven per cent per annum from February 13, 1924. That on said thirteenth day of June, 1924, the defendant paid to the plaintiff on account thereof the sum of $33,379.80, leaving a balance due the plaintiff in the sum of $10,000, with interest thereon at the rate of seven per cent per annum from the thirteenth day of February, 1924, and that no part thereof had since been paid, and the same was wholly due. The court further found that there was no compromise or agreement or settlement entered into between the plaintiff and the defendant whereby the plaintiff, for a valuable consideration, or otherwise, agreed to accept from the defendant, in full satisfaction of the indebtedness owing to her by the defendant, the sum of $32,615.50, with interest thereon from the thirteenth day of February, 1924, in lieu of the total indebtedness which then existed in the sum of $42,612.50. The court further found that the plaintiff accepted the said sum of $32,615.50, with interest thereon, instead of the sum of $42,612.50, by reason of a mistake made by one W. E. Mitchell in computing the

amount due the plaintiff from the defendant. The court further found that it was not true, as alleged in the defendant's answer, that the plaintiff and defendant had entered into an agreement of compromise whereby the plaintiff agreed to accept said sum of $32,612.50, with interest, in full payment of the sum of $42,612.50, with interest, owing by the defendant to the plaintiff. The court also found that the paper hereinafter set forth called "escrow agreement," was signed by the plaintiff in ignorance of the full amount due, and also in ignorance of the fact that W. E. Mitchell had made a mistake in calculating the amount owing from the defendant to the plaintiff, and that such mistake was not discovered by either W. E. Mitchell or the plaintiff until after the nineteenth day of June, 1924. The court also found that the defendant was aware of the mistake herein referred to. We have not followed the language of the findings, but have set forth the substance and effect thereof. Upon this appeal the appellant urges that an action in *assumpsit* will not lie, and also that the findings of the court are not sustained by the evidence.

The facts disclosed by the record are substantially as follows:

On the thirteenth day of February, 1924, there was pending in the superior court of the county of Los Angeles an action numbered 104,972, between the parties to this action, wherein the plaintiff in this action was plaintiff and the defendant in this action was also defendant. In that action the plaintiff was demanding judgment from the defendant for the sum of $90,000, with interest thereon from June 19, 1921, for attorney's fees and costs, and that certain pledged property be ordered sold. On the date mentioned the plaintiff and the defendant in this action entered into an agreement of compromise and settlement whereby the defendant paid to the plaintiff the sum of $40,000 in cash and agreed to pay to the plaintiff the sum of $10,000 on or before September 1, 1924; $10,000 on or before February 1, 1925; $15,000 or on before September 1, 1925, and $7,612.50 on or before February 1, 1926, with interest thereon at the rate of seven per cent per annum until paid, in full satisfaction and discharge of the indebtedness claimed by the plaintiff in the action numbered 104,972, a list of securities hereinafter mentioned being held by plaintiff to insure the

payment of the sums herein mentioned, which sums aggregate $42,612.50, as the principal sum owing. Prior to the eleventh day of June, 1924, the defendants had made some proposals to the plaintiff to accept other securities than those held by her, but these proposals were never acted upon. On the eleventh day of June, 1924, the defendant stated to the plaintiff, according to the plaintiff's statement, that he wanted to pay her what he owed her, but wanted her to take some certificates of deposit. What the defendant claimed as a version of this conversation will apear by his testimony later set forth. The plaintiff told the defendant she did not know what the certificates were and did not care to take anything with which she was not familiar. The defendant stated that if she did not want to accept the certificates he would give her cash. It appears that the plaintiff and the defendant went to the office of Hunsaker, Britt & Cosgrove, and in the presence of Mr. Hunsaker some conversation was had relative to paying the amount still owing on the contract of settlement to which we have heretofore referred, Mr. W. J. Hunsaker stating that Mr. Mitchell had attended to the matter; that Mr. Mitchell was out of the office, but that he would telephone to him, the plaintiff testifying that in the presence of Mr. Hunsaker and Mr. Marsh she stated that Mr. Marsh was going to pay the plaintiff what he owed her, together with interest, but desired her to accept in part payment some certificates of deposit; that she did not know what they were and did not want to take anything she did not know about. Mr. Hunsaker, after saying that Mr. Mitchell had attended to all previous matters connected with the business under consideration, proceeded to call Mr. Mitchell, who returned to the office of Hunsaker, Britt & Cosgrove. It appears that upon the return of Mr. Mitchell, the plaintiff, the defendant and Mr. Mitchell went to the private office of Mr. Mitchell; that Mr. Mitchell took the contract to which we have hereinbefore referred, calling for the payment of $42,612.50, together with interest thereon from the date named in the instrument, following the plaintiff's statement that the defendant was proposing to pay her the amount owing and also wanting her to accept as part payment the certificate referred to, and proceeded to compute the amount owing as of the date of June 11, 1924. This computation was made

by Mr. Mitchell and set down by him upon a piece of paper which was introduced in evidence and practically beyond question proven to be in the handwriting of Mr. Mitchell. The computation made by Mr. Mitchell on the date mentioned is as follows:

```
"Statement to June 11/24
 10000
 10000 Int. fr. February 13th/24
 15000
 7612.50
 _____
 32612.50
 7 3 mo. 28 days
 _____ 9)2282.88
 12)22828 750 _____
 ........... 570.72
 190.24 177.58
 3 _____
 _____ 748.30
 570.72
 30) 190.24 ( 634-2/15
 180. 28
 ___ ___
 102 6
 90 5072
 ___ ____
 124 1268
 ___ ____
 $177.58=
Principal ...................................32612.50
Interest ................................... 748.30
 _____
 $33360.80
Certf. ...................................25000.
 _____
Cash ................................... 8360.80"
```

After this computation was made the plaintiff, the defendant and Mr. Mitchell went to the office of the Security Trust & Savings Bank and had some conversation relative to the certificates. It appears that the certificates bore interest at the rate of four per cent per annum but did not mature for about six months. After some conversation the plaintiff declined to accept the certificates and stated that she would accept the cash, stating the amount which Mr. Mitchell had computed as being due, to wit: $32,612.50 as

principal and interest thereon from the thirteenth day of February, 1924. The defendant thereupon stated that he would pay the cash, and the writing called the "escrow agreement" was made out, giving the defendant ten days within which to pay said sum. The writing just referred to is in the following words and figures:

"Escrow Instructions No. 545600

"Los Angeles, Cal., June 11th, 1924.

"Title Guarantee and Trust Company:

"I hand you herewith note for $100,000.00 executed by Robert Marsh in favor of A. M. Salter, dated September 19th, 1924, and

"Certificate of stock No. 29 for 3333⅓ shares of the Main, Broadway and Hill Street Investment Company, also

"A release of interest until Title Insurance and Trust Company, Trust No. 4232, which you are authorized and instructed to deliver to Robert Marsh or his order when you can hold for my account the sum of $32,612.50 plus interest thereon at 7% per annum from February 13th, 1924, to date of payment to me, and you shall deposit the same in my account in the name of Mrs. A. M. Salter in the Main Office of the Security Trust & Savings Bank, Los Angeles, Calif., and notify my below mentioned attorneys.

"Your company is hereby relieved of all liability and responsibility in connection with the validity and legality of the certificate of the stock above referred to or the transfer of same on the books of the company and it is understood and agreed that your company is relieved of all liability in connection with the $100,000.00 note above referred to except as to the delivery of same.

"This escrow is to run for a period of ten days from date hereof unless the time limit is extended by mutual written consent of the parties hereto. In the event that the escrow is not consummated within the 10 day period and no such extension has been had, all papers and documents deposited by me herein are to be returned to Hunsaker, Britt and Cosgrove or to Mrs. A. M. Salter on demand of either of them.

"It is agreed and understood that all charges and expenses incurred in connection with this escrow are to be paid by Robert Marsh.

"In the event that the conditions of this escrow have not been complied with at the expiration of the time provided for herein, you are instructed to complete the same at your earliest possible date thereafter, unless I shall have made written demand upon you for the return of all instruments deposited by me.

> Signature: Mrs. A. M. Salter
> Address: 533 No. Mariposa Ave. L. A.
> Phone: 593201

"I have read, understood and hereby approved instructions as given above and have examined and approve the instruments and documents called for to be delivered to me, and hereby relieve your company of all liability and responsibility in connection with same except with delivery thereof.

"ROBERT MARSH."

During the period mentioned in this writing the defendant paid the sum therein mentioned, the securities referred to were delivered to him and the original action which we have heretofore mentioned was dismissed.

Following the discovery of the mistake made by Mr. Mitchell in computing the amount due, this action was commenced, the defendant having previously declined to pay the further sum of $10,000 and the interest accrued thereon.

The answer to the contention that the findings of the court as to the mistake in the computation of the amount owing, and that there was no compromise or agreement to accept less than the amount owing, is completely answered by a summary of the testimony.

William J. Hunsaker, one of the witnesses for the plaintiff, testified that he had been acquainted with W. E. Mitchell for many years; that Mitchell had been connected with the law firm of which the witness Hunsaker was a member, for a long period of time; that he was perfectly familiar with the handwriting of Mr. Mitchell; that the paper containing the computation as hereinbefore set forth in this opinion was wholly in the handwriting of Mr. Mitchell. The witness also testified that he had known the plaintiff for a considerable period of time; that on June 11, 1924, the plaintiff and the defendant came to his office; that upon coming to his office Mr. Marsh stated as follows: "Judge, I am trying to pay or going to pay Mrs. Salter

what I owe her, and I want her to take some $25,000.00 in certificates of deposit of the Continental National Bank, and she wants to talk to you about it." "I can't recall all that was said; there was considerable discussion on that subject. I remember that I said to Mr. Marsh or inquired of Mr. Marsh why he wanted to give her certificates of deposit; if he could get the certificates of deposit, why couldn't he pay cash. And he said he was making some sort of a three-cornered deal and it was important to him to do it that way. At some stage of the conversation I telephoned to Mr. Mitchell to come over. When Mr. Mitchell arrived I said to him that Mr. Marsh was about to settle with Mrs. Salter; that he was familiar with the transaction, having taken care of the compromise and I would ask him to take the matter, and I think I had, either before they came in or after Mrs. Salter telephoned me, or while they were there, sent out for the office file, and I believe I handed the file to Mr. Mitchell and asked him to take care of the matter. That while Mr. Marsh and Mrs. Salter were in his office discussing the matter with him, there was not anything said or any suggestion made by anyone present that Mr. Marsh was to pay or that Mrs. Salter was to receive anything else or other than the full amount of principal and interest to which she was entitled under the compromise agreement of February 13, 1924. The witness further testified that Mr. Mitchell was deceased. The plaintiff testified, in substance, that she and Mr. Marsh went to the office of Mr. Hunsaker; that she stated to Mr. Hunsaker that Mr. Marsh was going to pay off what he owed up to date, with interest, and wanted her to accept in part payment some certificates of deposit; that she did not know anything about certificates; that Mr. Hunsaker stated that Mr. Mitchell had taken care of the transaction for a good many years, and he would call him; that when Mr. Mitchell came in he was told what we were there for; that Mr. Marsh was going to settle up what he owed. Mr. Mitchell was asked to look after the matter. That we then went into Mr. Mitchell's office; upon arriving there I informed him what we were there for. I said Mr. Marsh wanted to pay me in full with interest but he wanted me to accept certain certificates of deposit and I did not know anything about them. Mr. Mitchell said that was for the two of us to decide what we

were going to do, and he did not care to decide for either one of us. He said that some officer of some bank should be asked about it and take his word for it. Mr. Mitchell said that we could go over to the Security Trust and Savings Bank, and that he would be over in a few minutes. On arriving at the bank we consulted an officer of the bank. Mr. Marsh said to Mr. Mitchell that it would be quite an accommodation for me to take the certificates of deposit; that they were just as good as cash. While we were in Mr. Mitchell's office, he had the papers before him; I do not know what the papers were that he was examining. He had a pencil in his hand while he was sitting at his desk; I do not remember whether I saw what he was doing; I think I saw him making some marks on the paper but I did not know what they were. Mr. Marsh and I then went over to the Security Trust Bank and Mr. Mitchell joined us in a few minutes. We spoke about going over to the bank to ask some officer about the certificates of deposit. At the bank Mr. Marsh said to one of the officers that he wanted to offer me some certificates of deposit in part payment of settlement, and I did not seem to feel that I knew what they were, and were not they just as good as cash. Mr. Toll, the officer, said: 'Why don't you just give her the money, if she would rather have the money, instead of giving her the certificates of deposit?' Mr. Marsh stated that he could not understand why I wouldn't accept them, and then I told Mr. Toll I did not know anything about them and I felt I would rather have the cash, and would he accept them; or would he take cash, and he said he wouldn't accept them; that there was no reason why I shouldn't have the cash; and then Mr. Marsh asked him if he wouldn't accept them, and he said no, and then I decided I didn't want them. At the time I saw Mr. Mitchell in his office he was writing on something; I think it was on a white piece of paper; I remember seeing the paper at the Security Bank; he had a little memorandum with him and I recall him saying, 'This is the amount.' He said, 'These are the amounts that are due.' I saw the paper again at the Title Guarantee office. The paper was handed to me on June 11th, by Mr. Mitchell.''

The record shows that following this conversation the paper called the ''escrow'' was made out, the amount entered therein corresponding to Mr. Mitchell's figures.

The witness further testified, in substance, that not one word was ever said to her by Mr. Marsh on June 11, 1924, about the plaintiff accepting less than the amount owing to her, as set forth in the compromise agreement of February 13, 1924. We may here state that the record does not show that the defendant ever made any such proposition to the plaintiff during said period of time, nor does the record show that the defendant ever made any proposition of compromise or settlement on June 11th, at the time of the execution of the so-called escrow paper, asking, suggesting or intimating to the plaintiff that in paying cash he wanted her to discount the amount owing, or to accept any sum whatever in payment or settlement less than $42,612.50, with interest thereon, as evidenced by the settlement dated February 13, 1924. This all appears from his own testimony as the following summary will show. The defendant testified:

"I said, 'Mrs. Salter, I would like to submit to you a proposition of paying off and anticipating the contract.' She says, 'What do you mean?' I said, 'Rather than to hold that continuing contract that you have, I would like to submit some contracts that we have on hand and some mortgages in payment of it.' 'Well,' she said, 'I wouldn't mind listening to any proposition, and what have you to offer?' I mentioned several contracts on National Boulevard Heights and mortgages. This was preceding the eleventh day of June, 1924. Nothing came of these conversations. On June 11th I called up Mrs. Salter and told her I was prepared now to discuss the question of settlement of the contract on a cash basis, and in part payment of cash I had certificates of deposit I wanted her to entertain as part of the cash. She said she did not understand what certificates of deposit were but would meet me and then go to her attorneys and decide definitely what she would do. She asked me to meet her in the safe deposit department of the Security Trust and Savings Bank where she had her deposit box. After we met, Mrs. Salter said, 'What are these certificates of deposit?' I said they were the same as cash to this extent; it was the obligation of the bank to pay money but had to run for a period of six months. And I said, 'Mrs. Salter, in discussing these certificates of deposit I consider them the same as cash, so when I am speaking of certificates of deposit, I feel that I am talking

cash to you.' She asked me what interest they paid and I told her four per cent, but that difference I would pay; I would pay her the difference between four and seven per cent, which would make it identical with cash in so far as the interest was concerned. Mrs. Salter said, 'Well, we will go up and see Mr. Mitchell and will decide definitely what cash we will take in complete settlement.' We went up to Mr. Hunsaker's office. I said, 'How do you do, Mr. Hunsaker.' I said, 'We are up with Mrs. Salter regarding a settlement, and as I stated to Mr. Hunsaker, a cash settlement with the exception that I am offering her some certificates of deposit which she wanted to ask Mr. Mitchell or yourself about.' Mr. Hunsaker said, 'Mr. Mitchell is not in; he is over at the Pacific Finance Building, but I can get him on the phone and have him come over, and he is the man to discuss this matter with because he has handled the matter from the start.' So Mr. Hunsaker phoned for Mr. Mitchell to come over. Mr. Hunsaker said, 'You are speaking of certificates of deposit, Mr. Marsh. Why don't you use cash instead?' 'Well,' I said, 'I am making a three-cornered deal and taking these certificates of deposit; that is the reason I want to use them.' We discussed the matter in a few words. I said I had told Mrs. Salter in discussing it with her that they were the same as cash. In a short time Mr. Mitchell came in. That was all the conversation between Mr. Hunsaker and me. Mrs. Salter and I stayed there and talked just as you will when sitting waiting for someone, and while sitting there, she turned to me and said, 'Mr. Marsh, what is the face of the contract or the amount of the full contract?' I said, 'About $40,-000.00.' I do not recall anything else, only she said, 'I don't think very much of certificates of deposit because I don't know anything about them.' When Mr. Mitchell came in Mr. Hunsaker said, 'Mr. Mitchell, Mrs. Salter is here with Mr. Marsh. Mr. Marsh wants to make a settlement with her. Will you handle the proposition?' We then went to Mr. Mitchell's office. Nothing was said about paying the balance in full. The witness further denied that anything was said to Mr. Mitchell that he was there to pay the amount of the contract with interest; Mr. Mitchell gave Mrs. Salter a chair adjoining his desk and sat down at his chair at his desk. Mr. Mitchell asked, 'What about these

certificates of deposit?' And I explained to him as I had explained to Mrs. Salter. He said, 'What do you mean?' I said, 'These certificates of deposit run for six months and bear four per cent.' I said to Mrs. Salter, 'They are the same as cash.' He said, 'Well, anything that is not cash is not the same as cash'; that they are the obligation of the bank; the only difference is that they bear four per cent, and that I would make up the difference. I then turned to Mrs. Salter and said, 'Why don't you call up Mr. Toll down to the bank?' She said, 'We might do that; that would be the thing to do because I am satisfied that he could explain it thoroughly.' Mr. Mitchell suggested that we go over to the bank and that he would join us a little later on. I did not say to Mr. Mitchell that I wanted to pay the balance in full. I did not, in his office, use any words, in substance, to that effect. After going to the bank the witness testified that Mr. Mitchell and the plaintiff had a short conversation when they were standing a few feet away from where he was, and then the plaintiff came up with Mr. Mitchell and said, 'Well, Mr. Marsh, I have discussed it with Mr. Mitchell. I don't want the certificate of deposit.' And he stepped up and said, 'Yes, I have so advised her.' But she says, 'What I will do will be to take cash, and I don't want you to talk to me about any certificates of deposit or anything else but the cash. I will take this amount if you are able to raise the cash. Now, can you do that?' She mentioned the amount and it was $32,612.50. I said, 'I can raise the cash.' She says, 'Well, we will make an escrow right here at the bank.' I said, 'No, if you are going to make it an escrow, I would rather have you make the escrow at the Continental Bank, because I am arranging a loan there.' He says, 'I don't know them there at all. I wouldn't advise Mrs. Salter to go to the Continental.' He says, 'We will either make it here or at the Title Insurance.' I said, 'Then let's make it the Title Guarantee.' He said, 'All right.' The witness then stated that they then went over to the office of the Title Guarantee Company. Mr. Mitchell said to Mr. Wilson (an officer at the office of the Title Guarantee Company), 'We have an escrow that we would like to have you take.' He said, 'All right; what sort of an escrow is it?' Mr. Mitchell said, 'We are making a settlement here and I

want to hand you a note and some securities, and Mr. Marsh is to hand in certain moneys.' And Mr. Wilson called a stenographer and took out a long pad of yellow paper and began to make notes. Then Mr. Mitchell gave him the details of the transaction and dictated to the stenographer. The escrow was then typewritten. It was handed to Mr. Mitchell, and he read it over aloud and then we signed it.''

The foregoing summary of the testimony contains all that is material and shows beyond controversy that nothing whatever was said between the plaintiff and the defendant at any time, or between the plaintiff and the defendant and Mr. Mitchell relative to any discount of the amount owing, in order to effect a cash settlement. The whole subject matter of the conversation hinged about the certificates of deposit, and when the amount of the calculation made by Mr. Mitchell was stated to the defendant he immediately accepted the same and the ten days was allowed for him to raise the cash. It cannot even be contended that the defendant was negotiating for a discount as he never even mentioned the subject to the plaintiff. He was talking to her all the time about the certificates and knew all the while that the amount owing was something over $40,000, and when the amount owing was erroneously stated to him by the plaintiff at $32,612.50 instead of $42,612.50, he simply remained quiet and stated he could pay the cash. Was the statement as to the amount owing made by the plaintiff to the defendant the result of a mistake? As heretofore stated the plaintiff stated to the defendant the amount owing, basing her statement upon what had just been said to her by Mr. Mitchell. We have only to examine the paper upon which Mr. Mitchell made his computation to verify the finding of the court as to the mistake. In the upper left-hand corner of that statement we find the figures: 10,000, 10,000, 15,000 and 7,612.50, added as aggregating 32,612.50. To argue that a mistake is not apparent in this addition is an insult to intelligence. The computations further contained on the paper to which we are referring show that the interest was calculated upon the mistaken principal of $32,612.50. The paper also discloses a further important fact: There is no indication whatever that any discount was carried into the computation. The paper shows the amount of the principal as erroneously computed, the interest

thereon, and then the proposed payment of certificates in the sum of $25,000 and the balance that would remain as cash. Thus, the only conclusion that could be arrived at by the trial judge was that when Mrs. Salter stated to the defendant what she would accept, she was simply eliminating the certificates and saying that she would take the cash according to the erroneous computation, nothing more, nothing less, not indicating in the slightest degree that the plaintiff was contemplating a discount or a rebate on the amount owing of a sum between $10,000 and $11,000. We do not very well see how any trial judge could find other than the trial judge did in this case in so far as the question of mistake, in so far as the absence of any compromise, and in so far as every material circumstance relating thereto is involved.

It is further argued that the writing called "Escrow Instruction Number 545,600," left with the Title Guarantee Company, constituted an agreement of compromise. A reading of this instrument leads unavoidably to the conclusion that the trial court was correct in rejecting this contention. The writing is in no sense an agreement of any kind. It is simply a direction to the Title Guarantee Company that if so much money is paid to them for the account of the plaintiff within ten days, all the securities mentioned therein and then and there placed in the custody of the Title Guarantee Company, may be delivered to the defendant. There is not a single word in this writing indicating that the plaintiff, on the one hand, was accepting, in full payment, less than the amount owing to her, or that the defendant was making advance payments on account of receiving a discount on the amount owing. The whole argument of the appellant is based upon the untenable assumption that this instrument, in and of itself, is a compromise agreement, and therefore the only action that could be maintained would be an action in rescission. At best, it only amounts to a form of release, and had it expressed the true amount, would have operated as a release to the defendant upon paying the full amount, and comes directly within the terms of section 1542 of the Civil Code, which reads: "A general release does not extend to claims which a creditor does not know or suspect to exist in his favor at the time of executing the release which, if known by him, must have materially affected his settlement

with the debtor." And, as stated in *Rued* v. *Cooper*, 119 Cal. 463 [51 Pac. 704]: "This action does not limit relief to actions based upon fraud or concealment by the debtor, but includes actions based upon mistake." There being no compromise agreement, there appearing nothing in the record from which it can be concluded either that the parties, by reason of any oral contract or written agreement, intended to discount or reduce the amount of the principal owing on June 11, 1924, the authorities cited by counsel relative to compromises are wholly inapplicable and do not need to be reviewed herein. What constitutes a compromise that would be effective and bar further action is set forth in 5 California Jurisprudence, page 399, section 14. A reading of this section and the authorities there cited shows that the case at bar is readily distinguishable from the basis upon which the defendant's appeal is founded, and that the argument advanced in support of the appeal is at variance with the law governing this action.

That an action of *assumpsit* to recover the omitted item of $10,000 will lie is clearly established by applying the rule of law set forth in the case of *White* v. *Thompson*, 40 Cal. App. 447 [180 Pac. 953], in an opinion written by Mr. Justice Waste. This case refers to items omitted in the settlement of an account. Here we have four different items that should have been added together in order to ascertain the amount of principal owing. In making the calculation the calculator failed to follow the rule of carrying one when making his computation, and therefore just omitted the sum of $10,000. In the case of *White* v. *Thompson, supra,* the court said, in an action to recover upon the omitted item instead of for rescission, that "It appears to us that the action at bar is merely a legal action in *assumpsit* to recover an item of indebtedness owing from defendants to plaintiff's assignor, which was entirely omitted in the negotiation leading to the account stated. While a suit to open, surcharge or falsify an account is one proper for equitable jurisdiction, yet the rule seems to be established that a stated account need not be impeached by a direct suit brought for that purpose. It may be impeached for fraud or mistake either at law or in equity whenever it is brought forward as a defense or cause of action." (Citing 1 Cor. Jur. 715.) And, also, the court further said: "An action

in *assumpsit* will lie to recover for item of indebtedness omitted by mistake on the settlement of an account if there is no other objection.'' (Citing a number of authorities.) And, further: ''An account stated does not bar a recovery for items not within the contemplation of the parties when the settlement was made.'' We do not need to cite any further authorities to support the rules of law stated in this case. We need not cite any authorities to the effect that where one, through mistake obtains a release and surrender of securities for a sum less than the amount owing, that the law raises an implied promise to pay the amount owed. The subject, however, is dealt with in 3 California Jurisprudence, 374.

We do not need to give any attention to the argument, *pro* and *con,* by counsel as to the character of the defense set up in this action, or as to the attempt of the defendant to escape payment of his just obligations, but prefer to let the record itself stand as the uncontrovertible support of the trial court's findings in this cause.

The summary of the facts which we have hereinbefore set forth relieves us of the necessity of reviewing the numerous cases cited in the voluminous briefs submitted to us for consideration.

The judgment of the trial court is affirmed.

Hart, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on November 22, 1928.

All the Justices concurred.